I am pleased the court would like to address the standard of review for this case and then how that standard should be applied to the elements of the decision of the district court blow. I believe that the district court blow did not use a correct legal analysis decision to deny the attorneys a single issue before this court. That is a matter of review de novo. If the basic standard is abuse of discretion, one way a court can abuse its discretion is to make a legal error. That doesn't convert it into a de novo review. That's simply one element of an abuse of discretion review. Yes, Your Honor. I believe that under both Smith v. CMTA and under Kmart v. United Foods that if a court nevertheless approached a long legal standard, which I'll address in a moment, that that itself is a question of law and would be reviewed de novo. If I may address that, Your Honor. I don't think we're in disagreement, but would you agree that we review the ultimate decision to grant or deny attorneys fees for abuse of discretion? I believe, Your Honor, under the Smith case, as I've cited, it breaks down into two parts. Part of it is on abuse of discretion and part of it is de novo in regard to whether the correct legal analysis or standard was used. But isn't that part of the abuse of discretion review? You look at did the district court make an error of law? If it did, that itself is an abuse of discretion. It doesn't convert to standard. It's simply part of the analysis. My particular, Your Honor, drawing contention to Kmart v. United Foods, I believe that if they do use the wrong standard, that in itself is de novo, in addition to whether when applying that standard or applying the standard they did, that may become a question of clear error or abuse of discretion. May I explain that? Go ahead. There's two different models that can be used, and this Court has referred and inspired decisions to both models. There's the special circumstances model, whereby the unless standard can show that there were special circumstances for bringing its case, the beneficiary prevails and gets attorney's fees. As a matter of fact, under the Penney, Grove, Solomon decision, it's unnecessary to ever go to the Hummel factors and use that model. Now, usually special circumstances and the factors are the same, but not always. And I believe that in this case, Your Honor, the legal standard being used was was there any special circumstances? I find that there's not only a lack of special circumstances on standard of the law, but in point of fact, because of its conflict of fiduciary position, there were special circumstances that result in a per se violation entitling myself to the recovery of the attorney's fees or my client. And in that regard, Your Honor? So in other words, if we look at what standard was doing, we find that they're faced with a claimant who has has defrauded them for years under a different plan. They find out about it, try to recover that money. And we finally say, well, you can't offset it against the second plan. They're in court. They settle with this defrauder on all issues. And now you want attorney's fees. Weren't those special circumstances for standard to go to court and try to stop this fraud? Let me address that. The fraud took place in a prior case. Right. That conduct was grounds leading to a full recovery granted them by a judgment in a prior case. They were trying to recover the money. They got that recovery. They got that judgment. That judgment, that recovery was under issue preclusion and merger. That was what they were entitled to. That's all they asked for. This case, Judge Fernandez has already found in the Ninth Circuit decision in 1997, that there was no. Yeah, but legally, legally, legally, they could not offset. But that doesn't change the fact that they, in that prior plan, were defrauded of thousands of dollars by this guy. And doesn't that almost compel them to go to court to try and recover the money? They did go to court and try to recover the money. And they knew when they'd begun this case, at the time that they filed this action, which is where you look for the special circumstances under a long tradition of law that I can address if the court wishes. At the time they filed this action, there was no dispute between the plan and Mr. Sacklot. They were a third party. They were a fiduciary. And what did they know at that time? At that time, they knew under the code, under 1104, that they were to discharge their obligation solely in the interest of the plan beneficiary. That's what the code says. They have to pay those monies, and they also knew at that time that those monies had already been found to be exempt from recovery. They could not deal in their own interest. What they did do is they intercepted that money in their own interest to hold the money for themselves at a time when they had no authority to do so, and that indeed they entered into an agreement which said, if we are unsuccessful because these monies are exempt, if Oregon declares that, we will give you those monies. And that answers any question about whether there was any misrepresentation or otherwise. They were going to enter into that agreement. They entered into that agreement. They admit they entered into that agreement. And the minute that they were unsuccessful, they said, let's try a Hail Mary. Let's come back to this court and take an approach for which there was no precedent. And indeed, Your Honor, they did proceed to collect monies on their judgment. They did proceed to garnish wages. They did proceed to make a recovery in which they could make a recovery on non-exempt funds. That was already part of the result of the merge decision in their first action. But they're precluded from using that to grant them further relief in this action. They already got the full relief they had asked for. And as a matter of fact, Your Honor, at the time they brought that action, they knew he was penniless. They declared that. They declared he was pursuing informed preposterous. They knew that he needed heart surgery. They knew that that was the intended use of the money, that he actually had a heart transplant. And they knew that the anti-rejection drug, at a cost of $800 a month, were needed or he was going to die. And that is supposedly the whole purpose of disability benefits. It has nothing to do about making other creditors whole. And I think Judge Fernandez said they're in the position of any other creditor. Lastly, Your Honor, on that point, when they brought this action, not only were they under the special circumstance of conflict of their fiduciary duty, that they ignored. They held the monies. They poured in. They held the monies themselves. They did not give it to him, even though they agreed to, because they recognized under that agreement that they were his monies. But they declared to everyone, they're vested, they're his. We have no right to them anymore. Those monies were due under the plan and no exception was found for the reason why they wouldn't be due to him for their intended purpose. That's a decision that Congress made and that's a decision all the states have made and that we've adopted under our own federal rules to follow the decisions of the state as to what are exempt benefits. Even if you were to go to the Hummel factors on a different model, the case law appears to indicate that those factors are not always appropriate, that when you're sued as a beneficiary defendant, the beneficiary doesn't have to show that he's attempting to deter others. He doesn't have to show that he's trying to benefit other participants. Rather, what was important in this case was the fact that when they brought this action, they were imposing a greater burden on him than any benefits he could derive, and they knew that, and that was part of what they did. They were imposing that benefit on him, and there was no question about whether he was entitled to the benefits. They declared that right from the beginning. In their complaint, they say he's entitled to these benefits. Lastly, they never withdrew from that position until they saw the writing totally on the wall. They had no chance of coordination of benefits. Under the Boston Mutual decision, they had drawn the plan. They had full responsibility for crafting a clear coordinations provision. They knew that. They knew that under the plan, and I presented this in the record and point the court to it, that the only thing they could coordinate was, quote, your disability, and that was during the term of the plan. And they are trying to coordinate a disability and coordinate facts that were years before, which the plan says you can't take into consideration. You're only coordinating benefits for that disability that was covered by the plan at that time. Moreover, Your Honor, under Wetzel, they became well aware of the fact that they had four years to commence that action. They waited more than six years. They declared in their complaint that they knew about the coordination as early as August of 1987 when he presented his claim under the master plating plan. They obviously knew about the IE plan. They waited more than six years until September 1993 to bring the action. Let me ask you this. Judge Morrow says on page 19 of her order that the histories of the parties' interactions make clear that Soklod and Sigelman, she's referring to you, I guess, by name, did not take steps to provide the information standard needed to process the claim after the Ninth Circuit ruled in 97 and negates any suggestion that standard refused to pay benefits in bad faith. It's also evident that Soklod and Sigelman knew at all times after 1995 that the range of recovery was limited, yet they multiplied proceedings and failed to avail themselves of opportunities to resolve the matter outside the litigation process by providing necessary information and pursuing an administrative appeal. Let me address that exactly. I'm going to tap on you. Yes. February 16, 1999, a day before the summary judgment was to be heard, without any notice to anyone that they're required to give, they came out with, we've made an administrative decision, no opportunity to participate. Who's they? Standard. Okay. Standard issued its administrative decision without any participation on the eve of the summary judgment, which they thought they were going to lose. Immediately, within a week, a letter was written by myself saying, you've tendered some money. You've deducted coordination of benefits. If I cash that check, does that mean I've agreed with you? Just tell me. No response. As the record will show, up to a year and a half later, I'm still asking that question. August 10, 2000, letter. Standard has failed to pay at least those benefits denied, which no longer can be challenged. Standard also fails to acknowledge whether or not acceptance of the limited payment would be deemed an acquiescence. That's a letter to them. No response. But what had I done? And the court will find this in the record beginning on page 706. Throughout, I had provided them all information. I drove to their offices on numerous occasions to try to get an evaluation. I presented them all the information as to where he was employed. And as the record shows, Mr. Stocklaw never denied them any medical information. He signed, and you'll find in the record, medical authors, medical, excuse me, had the doctor send medical reports in 94 and 95. He gave them information ultimately where he was employed, and immediately when I gave them that information in May 1996, they took and subpoenaed those records. This is when he was attempting to go back to work. Mr. Stocklaw provided them evaluations in May 96, in April 98, in August 98, and finally in September 98. And at all those times, when the insurance company contacted me, and this is in the record, saying, would you respond, I called Consul, and Consul said, that's our client, don't talk to him. They, however, never pursued any of the discovery. In fact, at that time, they stipulated, and I can cite to where in the record, that discovery was complete, that they needed no further information. Here's what Judge Morrow says. She says, in July of 1997, Socklot instructed Standard to communicate with him through Siegelman. When Standard requested the necessary information from Siegelman, he did not respond. After learning that Socklot had returned to work in February 95 and changed employers, Standard once again requested information from Siegelman in June 98. Again, he did not respond. Your Honor, on page 708 of my declaration, it indicates that I did respond, that I was compelled by the rules to deal only with him, that though they served no interrogatories, no requests for production, and no medical records, I immediately provided them information, and it's in the record, on May 18, 1998. And that's exhibit, Your Honor, 225. They wanted information as to where he was employed, that I provided that information to him in May 1998, and that Mr. Socklot never denied employment, and at all times, he had provided that information. And more importantly, Your Honor, I'm the one who wrote and provided them detailed information, which the Court will find on April 24, 1998, a complete discussion of the evaluation of the case at 782, the mail letter I've already mentioned. In August 1998, a complete discussion at 787, and at 789, a complete discussion again, thoroughly explaining where he was employed, what his medical condition was, and even giving them a chart. The Court's – that's not what happened. You presented all of this to the district court. Yes, Your Honor. And as part of the district court's decision, I'm looking at it. You're saying the district court's decision is clearly a wrong in fact. As to that fact, Your Honor. As to that fact. Factually, it's clearly wrong. Factually, yes. And that's an abuse of discretion, are you saying, then, in denying your fees, because your findings are clearly erroneous? Yes, Your Honor. If you were to use the HUML standard instead of the special circumstances standard, then that would be part of what's clearly erroneous, Your Honor. Under the bad faith. Under the bad faith, Your Honor, I believe is because of the breach of fiduciary  Do I understand that Mr. Salka recovered in this case $43,000? I'm sorry. Mr. Salka recovered $43,000 in this case? Yes, Your Honor. And the claim for attorney's fees is how much? It's – the Court never approached that because there was a question as to what parts were going to be included, but let me address that. It was about $300,000? It was close to that, Your Honor. And let me address that, Your Honor. This case did not involve anything to do with the administrative proceedings or whether he was disabled through September of 2000. That's when the Court, and I'll point to the record, said, okay, now we have an administrative record. Up until then, the only two questions before the Court presented was, could they get the set-off and could they get the coordination of benefits? And when they realized they were going to lose on both of those, and we had briefed those under the motion for summary judgment, they then went to the Court and said, what we would like to do is see if we can settle this. And if the Court looks at the District Court's memorandum on 651, the Court said without question, Mr. Sigelman, because you are asking for attorney's fees, and we also have Mr. Sokolat, I'm taking you out of this case unilaterally. Nothing from Mr. Sokolat. I'm going to have other counsel appointed to represent him, and then you will deal separately on your attorney's fees. Where that authority comes from, I don't know. But that was one of the problems that developed as to exactly putting me, I had the honor of the profession, to represent somebody, as Justice Fernandez said, who might be unflattering. And taking that on, spending $13,000 out of my own pocket because the doctors wouldn't give anybody an interview, and I had to bring in my own physicians, and paid for that and tried to make those doctors available. That was my reward, to be essentially taken out of the case, and Mr. Sokolat could have other counsel for the purposes of helping out Standard, because Standard says we want it to settle, and then leaving me out on the side. Obviously, the Court wasn't favorable to anything other than getting the case out. And you made an indication at that time that you wanted attorney's fees, if there was going to be settlement, and there would be amount of attorney's fees involved? Yes, Your Honor. As a matter of fact, there was. What was that amount of attorney's fees that was involved at that time in the settlement proposal? At the time, the Standard proposed $50,000, and I had said it's going to have to be more than that, and then, as you know, they tried to settle around me. No, but your claim was for $50,000 attorney's fees? No, no, that's what they, Standard, offered. For your attorney's fees? They offered $50,000. And what are they today? I didn't catch it. I believe the, I believe Judge Silverman's correct that there were something in the neighborhood approaching $200,000. $300,000 is what I had. Pardon? Isn't $300,000 what you asked for? In my rebuttal, I'll give the Court the exact amount. I do have it down. I presented to them in detail, full, my time and hours in detail. All right. May it please the Court. Peter Apresciati on behalf of Standard Insurance Company. Your Honors, I think there really are two overarching points here that are important, and I'm not, unless the Court has significant questions, I'm not going to restate everything that's in the brief. You have obviously read the briefs. The first point that's important is the standard of review, and as we stated in the brief, we submit it's, for all practical purposes, dispositive of this appeal. If the standard of review is going to be honored, and this case, and Judge Morrow's humble analysis, is considered consistent with this Court's precedent, we submit it's impossible to reverse. When the Court looks at the Kaushal case that we've cited, the California Iron Works case, the Honolulu case, and the Lyme, all of those cases involve this Court affirming the denial of fees under a humble analysis. And in all of those cases, the fact, the humble analysis provided by the district court was far more beneficial to the moving party than the humble analysis here. For instance, in California Iron Works, the Court concluded that, indeed, the risk, and it was prototypical risk litigation also, which this is not, but nonetheless, the Court concluded there was a benefit to all plan members there. In Honolulu, the Court said the plaintiff fully prevailed on every single issue in the case. This case stands in stark contrast to those cases. In other words, it's further along the spectrum than those cases. Here, this is not prototypical ERISA litigation, as Judge Nelson, as you noted early on. This case stems out of an egregious fraud against an ERISA plan, which was looted of hundreds of thousands of dollars. Standard proceeded to try to recover that money with two causes of action, equitable setoff, coordination of benefits. It got a summary judgment from a Federal district court judge on the equitable setoff. Came up to the Ninth Circuit. The Ninth Circuit reversed. Okay, fine. No equitable setoff. That's the law. Standard doesn't dispute that, but that is now the law. To contend that because one of Standard's causes of action was rejected by this Court should require Standard to pay $300,000 to someone who's already defrauded an ERISA plan of over $200,000, and with interest it was approaching half a million or $600,000, we contend borders on the ludicrous. There's no basis for fees here, and Judge Morrow made a very reasoned, detailed analysis of every single factor. If I may, I would like to just address a couple of points with respect to questions asked, and that is that the Court didn't use the correct legal standard. Judge Morrow used the correct legal standard. The standard is HUML. There's factors to apply and there's factors to consider. The special circumstances rule that was articulated indeed is not the law. The law is not that someone who prevails on one part of a case is per se entitled to feel, is per se entitled to fees unless special circumstances can justify the position taken by the insurance company. That's not the law. The special circumstances factor in this, you know, complex of factors is that there's generally a modest presumption that if you fully prevail, you're entitled to fees unless special circumstances would indicate that an award of fees would be unjust. Very different analysis. And here, Judge Morrow made a factual finding and a conclusion that special circumstances would render a fee award unjust. And that, I believe it's cited in her brief. However, I know it's Judge Morrow's book. On the record, she made it in a supplemental excerpt of record at page 410, lines 19 to 21 and 474, 20 to 21. She made that exact finding. Your Honors, I think this case really ends where it begins, and that's when Judge Gatboy, in his judgment, said, Mr. Sankoff is very lucky that this case wasn't reported to the U.S. Attorney's Office. He is very lucky to ask for $300,000 in fees when he was chasing what they knew was $43,000 in benefits. The scanner didn't know until 1998, notwithstanding multiple requests which weren't answered. And that is undisputed factual record that Judge Morrow founded. We contend it's meritless. Unless the Court has any further questions, we will submit. I guess not. Thank you. Thank you, Your Honors. I think you had 45 seconds left if you'd like to give us that citation. There's a quick summary on page 554 of the record of what it was in 2001. And, Your Honor, Judge Morrow's only comment on special circumstances is found at page 675, where she just says, this case does not present the unique and special circumstances and makes no – gives no reason why. Lastly, Your Honor, in regard to the amount of the attorney's fees pointed out that I believe we also find in the record, I also offer to settle for any amount of homology and letters that you say take equal amount. All right. Thank you. Your time has expired. The case just argued will be submitted, and we will stand in recess for the day.
judges: Brunetti, Tg Nelson, Silverman